## Kellyville Coal Company v. Jennie Bruzas.

1. MINER'S ACT—*section 18 construed.* The language of this sec-
tion as follows: "No one shall be allowed to enter the mine, to
work therein, *except under the direction of the mine manager* until
all conditions shall have been made safe," may not mean that the
manager shall stand over the laborer and direct every act he may
have to perform, but it does mean that he shall, by reason of his
special qualifications required by law, direct and tell a man who
is without such qualifications how to do his work.

2. LOSS OF SUPPORT—*what evidence competent in action for.* In
a suit by a widow to recover under the Miner's Act for loss of sup-
port arising from the death of her husband, it is competent to show
that she had two minor children.

Action on the case for death caused by alleged wrongful act.
Appeal from the Circuit Court of Vermilion County; the Hon.
JAMES W. CRAIG, Judge, presiding. Heard in this court at the
November term, 1905. Affirmed. Opinion filed March 20, 1906.

H. M. STEELY, for appellant.

DANIEL BELASCO and PENWELL & LINDLEY, for appellee;
WALTER C. LINDLEY, of counsel.

MR. JUSTICE RAMSAY delivered the opinion of the court.
Joseph Bruzas, husband of appellee, was killed while work-
ing in a coal mine of appellant. Appellee brought suit
under the act entitled "Mines and Miners," alleging that ap-
pellant was negligent in the management of its mine, by
means whereof deceased was killed and plaintiff damaged.
A jury returned a verdict in appellee's favor for the sum
of $1,700, upon which the court rendered judgment. The
coal company appeals.

The law upon which appellant's liability depends is part
of section 18 of chapter 93 of the Revised Statutes and reads
as follows: "No one shall be allowed to remain in any part
of the mine through which gas is being carried into the venti-
lating current, nor to enter the mine to work therein, except

under the direction of the mine manager, until all conditions shall have been made safe."

The evidence shows that the accident occurred early in the morning of May 11, 1904, and that on the night of the 8th of May, the mine examiner of appellant made an examination of the place where deceased was killed and found it was in a dangerous condition, and so marked it; that there was an uneven roof there and it looked as though it might come loose; that this particular entry was in bad shape and was so reported to the pit-boss.

The assistant mine manager was notified of the dangerous condition of the entry before Bruzas was killed, but he did not visit this particular place before the accident. Bruzas in his line of duty, as he understood, and in obedience to the order of the pit-boss or the mine manager to "go ahead and clean the place," went to the dangerous entry in company with others, and while there at work a large rock, described by one witness as "two carloads," fell from the roof of the entry upon Bruzas and killed him.

Appellant contends that the language quoted: "No one shall be allowed to enter the mine to work therein, *except under the direction of the mine manager* until all conditions shall have been made safe," does not mean that the work done, must be done under the *personal supervision* of the mine manager; that the legislature did not intend that the manager should himself, necessarily, go into the mine; nor that where danger is discovered in the roof of an entry that he should go along and stand by the men who were sent to remedy the defect; and reviews at great length the meaning of the word "direction."

We do not think it difficult to find the true meaning of the words employed in the act, when read in the light of all the surroundings. The act itself in which the quoted words are found, is entitled "An act to revise the laws in relation to coal mines and to provide for the health and safety of persons employed therein." So that every section in the act can and must be read in the light of the expression that the lives of persons *employed in mines* should be protected.

30

Furthermore, the statute upon this subject contemplates that
the mine manager shall have special qualifications, which
should give him knowledge of the work and its attendant
dangers, superior to those which the common laborer may
possess.  He must pass an examination and possess a license
from the State Board, after having furnished satisfactory
evidence of his experience and competency in coal mining
matters. . These requirements, which are all enacted in the
interest of the safety of persons in coal mines, suggest that
the mine manager under whom men are to work when con-
ditions are not safe, should discharge a peculiar and an ex-
acting duty.

On the night in question and at about one o'clock A. M.
the boss or manager, who knew of the dangerous condition
of the entry, said to Bruzas and others of his gang: "Go
ahead and clean the rock, clean the place," without going
with the men or directing them how or in what manner they
should proceed to make the dangerous spot safe; pursuant to
which order deceased entered upon the work and was killed.

We do not believe that such a command was the *direction*
which the statute contemplated.  In what way did such an
order give Bruzas the benefit of the mine manager's su-
perior knowledge and more extended experience ?  What
benefit did the laborer derive from the capabilities which the
manager gave evidence of when he was licensed by the State
to manage a mine ?  None at all.  Such an order could have
been given by a man who had never been in, or seen, a mine.
It was an order to *accomplish* a work, not directing *how* or in
*what* manner to do it.  It may be that the law involved
does not mean that the manager shall stand over the laborer
and direct each act he may have to perform, but certainly
it does mean that he shall, by reason of his special qualifica-
tions, direct and tell the man who is without those qualifica-
tions, how to do the work.  If the manager is so familiar
with the danger that he can give direction, such as the ex-
igencies of the case may require, without going in person to
the point of the danger, we see no good reason why he can-
not do so, but if, upon the other hand, he must go to the spot

in order to give such directions as will protect the lives of men who obey his order, then he must do that. The man who goes to a place of danger to do work under the order of the manager is entitled to the benefit of the manager's superior qualifications as to the manner of doing the work and the means to be employed.

Appellant contends that the particular section involved has no application to the case of deceased, because he belonged to what is called the *rock gang, i. e.,* a gang of men who are employed in making the mine and entries safe; that the law has application only to miners, diggers and drivers, *i. e.,* the producers of coal. This seems to us to be a very narrow and strained construction of the statute. Deceased was a common laborer working under express orders, not having any special qualifications beyond those who dug coal or drove a mule, and it cannot be seriously argued that one common laborer in a mine shall have the benefit or protection of this law, while it shall be denied to another. The title of the act declares it to have been enacted in the interest of *persons employed* in coal mines, and not in the interest of any particular class of such laborers. As shown by the evidence deceased had worked in the mine only a short time before he was killed, and had not recently before his death been in that part of the mine where the dangerous condition existed; nor was any instruction given to him on the night in question concerning the dangerous condition of the roof of the entry where he was killed. Although the assistant mine manager knew of that condition, he, without visiting the reported dangerous spot to determine just what its needs might be, sent Bruzas and his gang there to work, without the benefit of that superior skill and experience which, under the statute, the manager was required to possess and employ in the protection of life.

There is some conflict in the evidence as to what deceased was doing at the time he was killed, but there can be no doubt that he was trying to do, without direction, what, perhaps, he would never have attempted if his labors had been guided by that superior knowledge and experience which

the mine manager possessed, and to which the law clearly contemplates deceased was entitled. We think the evidence clearly warrants the verdict against the appellant for the negligence charged against it in the fourth and also in the additional counts of the declaration, where the charge is expressly made that Bruzas was ordered and permitted to work without being under the direction of the mine manager.

Appellant contends that the court was in error in allowing appellee to testify that she had two children, but we do not think there is any merit in the claim. In the case of Beard v. Skeldon, 113 Ill., 584, which was a suit by a widow under this same statute to recover for the death of her husband, the trial court instructed the jury that in making their estimate of damages they could take into consideration whether or not deceased left any children surviving him and the court then said: "The statute, in our opinion, authorizes but one action; but one recovery for the entire loss. If the deceased leaves a widow she is entitled to sue and recover for the loss, whatever it may be." That to require three actions to be brought by three different parties for one and the same cause of action would be productive of useless expense and it was therefore not error to give the instruction. This decision was referred to with approval in the case of Consolidated Coal Co. v. Maehl, 130 Ill., 551–556, and in Willis Coal and Mining Co. v. Grizzell, 198 Ill., 313.

Appellant criticises the action of the court in giving appellee's second instruction, which told the jury that "If under the evidence and instruction of the court they found defendant guilty, then in assessing damages they should assess same with reference to the pecuniary loss sustained by the wife," etc. We do not see how this instruction could have misled the jury. It did not direct a verdict; but, in substance, told the jurors, that if upon the evidence and under the instructions they found the issues for the plaintiff, what matters they could take into account in fixing her damages. In this respect the instruction in question differs materially from the one in Kranz v. Thieben, 15 Ill. App., 482, referred to by appellant.

Appellant's tenth, eleventh, twelfth, thirteenth and fourteenth instructions as offered were properly refused by the court, as they stated propositions of law not consistent with the interpretation of the statute involved, as herein expressed.

The instructions as given were not misleading, but fairly stated the law applicable to the case. The other assignments of error are not of enough importance and merit to warrant further discussion of the case.

There is no reversible error in the record and the judgment of the Circuit Court is affirmed.

*Affirmed.*